**RAINES FELDMAN LITTRELL LLP**
Kyra E. Andrassy (State Bar No. 207959)
*kandrassy@raineslaw.com*
Robert S. Marticello (State Bar No. 244256)
*rmarticello@raineslaw.com*
Stephen M. Mott (State Bar No. 362642)
*smott@raineslaw.com*
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

Counsel for Debtor-in-Possession
Ramanujan Group LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>RAMANUJAN GROUP LLC,<br><br>Debtor-in-Possession. | Case No.: 8:26-bk-10832-SC<br><br>Chapter 11<br><br>**MOTION PURSUANT TO 11 U.S.C. § 363(b) TO ENTER INTO PROPERTY MANAGEMENT AGREEMENT WITH JONES LANG LASALLE AMERICAS, INC. AS PROPERTY MANAGEMENT COMPANY EFFECTIVE AUGUST 21, 2026; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF**<br><br>[No Hearing Required Pursuant to Local Bankruptcy Rule 9013-1(o)] |

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:**

Ramanujan Group LLC, the debtor and debtor-in-possession (the "**Debtor**"), hereby seeks Court approval to employ Jones Lange Lasalle Americas, Inc. (**"JLL"**) as its property management company (the "**Motion**") in the above-captioned bankruptcy case pursuant to 11 U.S.C. § 363(b), effective as of August 21, 2026. In support of the Motion, the Debtor submits the following memorandum of points and authorities and the declaration of Howard Grobstein in support thereof, and respectfully represents as follows:

## I. BACKGROUND

On March 18, 2026 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned case. The Debtor is operating as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this case and no official committees have been appointed or designated. This case constitutes a single asset real estate case.

The Debtor is a special purpose entity that owns and operates an outdoor shopping center located at 3380-4175 Blackhawk Circle, Danville, CA 94506 (the "**Property**"). The Property is owned as a tenant in common with Iron Condor Investments, LLC, which holds a 5.5% tenant-in-common interest in the Property. In April 2020, the Debtor obtained a $28 million secured loan from Preferred Bank that was secured by the Property. In May 2020, Iron Condor became a co-borrower on that loan. The balance due on that loan is approximately $29.3 million. In November 2023, the Debtor and Iron Condor obtained a secured line of credit with Preferred Bank, on which the balance owed is approximately $3.1 million. Nano Banc holds the third priority lien against the Property and is owed approximately $6.1 million.

Prepetition, Nano Banc commenced litigation in Orange County Superior Court for, among other things, specific performance and the appointment of a rents and profits receiver. It also commenced nonjudicial foreclosure proceedings against the Property in August 2025. By order entered February 3, 2026, the state court appointed Douglas Wilson as the rents and profits receiver for the Property (the "**Receiver**"). The foreclosure sale was scheduled for March 23, 2026. After negotiations with Nano Banc were unsuccessful, the Debtor filed its emergency chapter 11 petition to avoid losing the Property to foreclosure. Iron Condor has not filed a chapter 11 petition.

Postpetition, Howard Grobstein was appointed as the Debtor's manager. As memorialized in a stipulation that was approved in substantial part by the Court, Mr. Grobstein is acting independently and does not report to or take direction from former management or equity holders. While Mr. Grobstein familiarized himself with the Property and the path forward, the parties agreed to keep the Receiver in place. While the Receiver was at the helm, he used cash collateral to pay expenses necessary for the maintenance and preservation of the Property, and the Debtor included the income and expenses on its monthly operating reports. Shortly after the Receiver was appointed, he retained JLL to provide property management services.

After a few months and by stipulation of the parties, the Receiver transitioned control of the Property to the Debtor, under Mr. Grobstein's management, effective August 21, 2026. That stipulation contemplated that the Debtor would continue to retain JLL to ensure continuity in operations. JLL continued to manage the Property while the Debtor and JLL negotiated the terms of its management services and, with the Retail Management Agreement now executed, the Debtor seeks Court authorization to enter into the Retail Management Agreement. JLL is a well-qualified property manager with a significant amount of experience in distressed situations and with retail centers and it has built trust with the tenants since it took over the property management at the Property. The Debtor believes that for purposes of continuity and so it can continue to build on the trust it has started to earn, it would be in the interest of all concerned to continue to retain JLL going forward.

## II. PROPOSED TERMS OF RETENTION

As set forth in the Retail Management Agreement from JLL that is attached as Exhibit "1," JLL will provide the following services:

**1. Property Management Services.**

a. Collect rents.

b. Receive tenant communications, ensure tenant compliance with lease provisions, and enforce Debtor's rights under the leases.

c. Subject to tenant obligations under leases, manage and maintain the Property, including monitoring and retaining independent contractors to repair and maintain the Property, and entering into contracts with contractors to clean, maintain, and service the Property. Subject to the approved operating budget, JLL will have authority, as agent for the Debtor, to enter into contracts and hire contractors to clean, maintain, repair, or service the Property. JLL will obtain the Debtor's prior written approval for any single repair expenditure in excess of $15,000 unless it is an emergency, in which case JLL will make the repair prior to obtaining authorization if it is necessary to prevent damage or injury to persons or property.

d. Pay operating expenses from an operating account established for the Debtor, with the Debtor listed as an additional signatory with authority to make withdrawals.

e. Collect lease, tenant, vendor, and financial information to the extent available from tenants, the prior owner or manager, or the Debtor and assemble property records, accounting ledgers, tenant files, and reporting systems for the Property.

f. JLL will provide a dedicated property manager, operations manager, and bookkeeper, and will allocate a percentage of their payroll to the Debtor as a payroll expense.

g. JLL may supplement the leasing and net operating income of the Property through a program of specialty licensing and ancillary income where license agreements are put in place with retailers and other users to occupy temporary space in the Property in exchange for rent or licensing fees, generally including a percentage of sales.

They are typically used for seasonal marketing needs, short term in-line vacancies, and as a way to generate additional income to the property owner.

**2. Financial Documentation and Services.**

a. On a monthly basis, JLL will provide the Debtor with financial reporting that includes all collections, delinquencies, uncollectible items, and other matters pertaining to the management, operations, and maintenance of the Property. These reports will be provided by the 15th of the month for the prior month.

b. JLL will maintain a separate and exclusive operating account for the Debtor with lockbox service.

c. JLL has provided a proposed operating budget and will continue to do that sixty days prior to the commencement of each fiscal year.

**3. Term.**

a. The initial term of the Retail Management Agreement is from August 21, 2026, through August 20, 2027, and it will renew on an annual basis. If may be terminated with thirty days' written notice and will terminate automatically upon the sale of the Property, the dismissal or conversion of the Debtor's bankruptcy case, or entry of an order of the Court directing termination.

## III. PROPOSED COMPENSATION

As set forth in the Retail Management Agreement and its addendum, which are together attached as Exhibit "1," JLL will receive the following compensation, subject to the consent of the Lender or the authorization of the Court for the Debtor to use cash collateral:[1]

| Fee Type | Fee Amount/Percentage |
|---|---|
| Management Fee | $10,000 per month, payable on the first day of each month. |

[1] In the event of a conflict between the Retail Management Agreement and the Motion with respect to compensation and the required authorization or consent to use the Lender's cash collateral, the Motion (and any order) will control.

| Fee Type | Fee Amount/Percentage |
|---|---|
| Payroll Reimbursement for the 3 dedicated JLL employees | $10,000 per month, payable on the first day of each month |
| Accounting Fee | $3,000 per month, payable on the first day of each month |
| Specialty Licensing/Ancillary Income | 20% of the specialty licensing and ancillary income revenues collected, plus any out-of-pocket expenses directly related to negotiating licenses. |
| Reimbursable Costs | JLL shall be reimbursed actual out-of-pocket costs incurred in connection with the operation of the Property. Lease abstracting is $175 per abstract. |

## IV. LEGAL ARGUMENT

Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1). Under applicable case law, courts will approve a debtor's proposed use of its assets under section 363(b)(1) of the Bankruptcy Code if it represents a sound business purpose on the part of the debtor. *See, e.g., Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19–20 (B.A.P. 9th Cir. 1988); *In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (Bankr. D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'"); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification).

Employment is not being sought under § 327 because most courts hold that a property manager is not a professional within the meaning of that section. *See, e.g., In re Park Ave. Partners L.P.*, 95 B.R. 605, 616-17 (Bankr. E.D. Wis. 1988); *In re Melbourne Beach, LLC*, 2020 WL 5745938 *3-*4 (Bankr. M.D. Fla. 2020).

The Debtor believes that the retention of JLL is in the best interests of the estate and a proper exercise of its business judgment. JLL is an experienced and well-respected property manager who has provided property management services to the Property and was initially retained by the Receiver to replace the former property manager, who is believed to have been affiliated with former management, who was removed. It is familiar with the Property and has developed relationships with the tenants, and its retention was part of the negotiated transition of control of the Property from the Receiver to the Debtor. The Debtor negotiated the rate with JLL and was able to obtain a reduction from the amount being paid by the Receiver. Payment of the property management and any leasing fees will be subject to either the consent of the Lenders or a Court order authorizing the Debtor to use cash collateral, which the Debtor currently has through November 18, 2026.

Because the Debtor believes that entry into the Retail Management Agreement is in the best interests of the Debtor's estate, the Debtor requests that it be approved.

## V. CONCLUSION

WHEREFORE, the Debtor requests that the Court enter an order:

1. Authorizing the Debtor to enter into the Retail Management Agreement with JLL pursuant to 11 U.S.C. § 363(b);

2. Subject to either the consent of the Lender or Court order authorizing the Debtor to use cash collateral, authorizing the Debtor to pay JLL the compensation provided in the Retail Management Agreement on a monthly basis; and

3. Granting such other relief as the Court may deem just and appropriate.

Dated: October 30, 2026

**RAINES FELDMAN LITTRELL LLP**

By: */s/ Kyra E. Andrassy*
Kyra E. Andrassy
Counsel for Ramanujan Group LLC

**DECLARATION OF HOWARD GROBSTEIN**

I, Howard Grobstein, declare as follows:

1. Effective April 17, 2026, I am the Manager for Ramanujan Group LLC, the debtor and debtor-in-possession in the above captioned case. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the *Motion Pursuant to 11 U.S.C. § 363(b) to Employ Jones Lang Lasalle Americas, Inc. as Property Management Company Effective August 21, 2026* (the "**Motion**"). Unless otherwise defined in this declaration, all terms defined in the Application are incorporated herein by this reference.

2. On March 18, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned case. The Debtor is operating as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this case and no official committees have been appointed or designated. This case constitutes a single asset real estate case.

3. The Debtor is a special purpose entity that owns and operates an outdoor shopping center located at 3380-4175 Blackhawk Circle, Danville, CA 94506 (the "Property"). The Property is owned as a tenant in common with Iron Condor Investments, LLC, which holds a 5.5% tenant-in-common interest in the Property. In April 2020, the Debtor obtained a $28 million secured loan from Preferred Bank that was secured by the Property. In May 2020, Iron Condor became a co-borrower on that loan. The balance due on that loan is approximately $29.3 million. In November 2023, the Debtor and Iron Condor obtained a secured line of credit with Preferred Bank, on which the balance owed is approximately $3.1 million. Nano Banc holds the third priority lien against the Property and is owed approximately $6.1 million.

4. Prepetition, Nano Banc commenced litigation in Orange County Superior Court for, among other things, specific performance and the appointment of a rents and

profits receiver. It also commenced nonjudicial foreclosure proceedings against the Property in August 2025. By order entered February 3, 2026, the state court appointed Douglas Wilson as the rents and profits receiver for the Property (the "Receiver"). The foreclosure sale was scheduled for March 23, 2026. After negotiations with Nano Banc were unsuccessful, the Debtor filed its emergency chapter 11 petition to avoid losing the Property to foreclosure. Iron Condor has not filed a chapter 11 petition.

5. Postpetition, I was appointed as the Debtor's manager. As memorialized in a stipulation that was approved in substantial part by the Court, I am acting independently and do not report to or take direction from former management or equity holders. While I familiarized myself with the Property and the path forward, the parties agreed to keep the Receiver in place. While the Receiver was at the helm, I understand that he used cash collateral to pay expenses necessary for the maintenance and preservation of the Property, and the Debtor included the income and expenses on its monthly operating reports. Shortly after the Receiver was appointed, he retained JLL to provide property management services.

6. After a few months and by stipulation of the parties, the Receiver transitioned control of the Property to the Debtor, by then under my management, effective August 21, 2026. That stipulation contemplated that the Debtor would continue to retain JLL to ensure continuity in operations. JLL continued to manage the Property while the Debtor and JLL negotiated the terms of its management services and, with the Retail Management Agreement now executed, the Debtor seeks Court authorization to enter into the Retail Management Agreement. I was able to pare down the services that JLL offered, not all of which were needed at this time, to reduce the monthly expenditure to JLL and these revisions are reflected in the Retail Management Agreement, a true and correct copy of which is attached as Exhibit "1." I believe that for purposes of continuity and so it can continue to build on the trust it has started to earn, it would be in the interest of all concerned to continue to retain JLL going forward, and that is why I agreed as part of the transition of control of the Property to the Debtor that JLL would be retained.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 20 day of October, 2026 at Woodland Hills, California.

Howard Grobstein

# EXHIBIT 1

JLL

**JONES LANG LASALLE AMERICAS, INC.**

**RETAIL MANAGEMENT AGREEMENT**

**WITH**

**RAMANUJAN GROUP LLC, as Owner**

**FOR**

**BLACKHAWK PLAZA**

**3380 Blackhawk Plaza Circle**
**Danville, CA**

# RETAIL MANAGEMENT AGREEMENT

This AGREEMENT is dated as of ____________ (the "Effective Date") and is by and between Ramanujan Group LLC, a Delaware limited liability company (hereinafter, "Owner") and JONES LANG LASALLE AMERICAS, INC., a Maryland corporation (hereinafter, "Manager").

## RECITALS

A. Owner owns that certain property known as ***Blackhawk Plaza*** located at ***3380 Blackhawk Plaza Circle, Danville, California 94506*** (the "Property").

B. Manager was previously retained as the property manager by Douglas Wilson in his role as receiver for the Property after being appointed by order entered on February 3, 2026 (the "Receiver Appointment Date"). The Receiver was transitioned out effective August 21, 2026, pursuant to a Bankruptcy Court order. Owner is under new corporate management effective April 17, 2026. Pursuant to the Order (1) Authorizing Retention of Howard Grobstein and Grobstein Teeple LLP and (2) Granting in Part Motion to Approve Stipulation to Appoint Howard Grobstein as Debtor-in-Possession Authorized Representative, the Bankruptcy Court supervising the Owner's bankruptcy case confirmed Mr. Grobstein's appointment as manager.

C. Owner desires to engage Manager as the exclusive property manager for the Property, to manage, operate, and maintain the Property on the terms and conditions set forth below.

D. Manager desires to accept such engagement and is in the business of managing, operating, and maintaining properties.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1. PROPERTY AND COURT SUPERVISION

### 1.1 Property.

The Property subject to this Agreement will consist of all of Owner's real property described on Schedule A and, except to the extent excluded on Schedule A, Owner's personal property located thereon.

### 1.2 Court Approval.

Owner has a chapter 11 bankruptcy case pending in the U.S. Bankruptcy Court, Central District of California, Santa Ana Division (the "Bankruptcy Court"). The Agreement and Manager's engagement, authority, and compensation under this Agreement are subject to approval by the Bankruptcy Court, in addition to the need for Court approval of the use of cash to pay Manager under this Agreement or a Court order authorizing the use of cash collateral. In the event of any conflict between this Agreement and any Court order, the Court order shall control.

### 1.3 Representative Capacity; No Personal Liability.

All obligations, liabilities, indemnities, fees, reimbursements and other amounts payable by Owner under this Agreement are obligations of the Owner's bankruptcy estate, payable solely from the funds and assets of the

Property and the estate, and shall be treated as expenses of administration. No personal or individual liability shall attach to the manager of the Owner or to any of Owner's professionals, employees, agents, or affiliates on account of this Agreement. Manager's sole recourse for any amount due hereunder is against Property funds and the estate, subject to the priorities established by the Bankruptcy Code and any order of the Bankruptcy Court.

## ARTICLE 2. TERM; TERMINATION

**2.1 Initial Term.**

Manager's duties and responsibilities under this Agreement will begin on August 21, 2026 (the "Commencement Date") and will end on August 20, 2027, unless sooner terminated as provided herein (the actual date established for termination being the "Termination Date").

**2.2 Renewal Term.**

To the extent not prohibited by law, this Agreement will automatically be renewed for additional successive one (1) year periods on its then existing terms and conditions.

**2.3 Termination.**

This Agreement may be terminated as follows:

(a) If either party defaults in the performance of any of its duties and obligations hereunder, the party not in default may terminate this Agreement upon: (a) five (5) days written notice to the defaulting party in the event of a monetary default or (b) thirty (30) days written notice to the defaulting party in the event of a non-monetary default, unless the default is cured within such thirty (30) day period or, in the case of a non-monetary default, if the nature of the default will not permit it to be cured within the thirty (30) day period, the defaulting party commences to cure the default within the thirty (30) day period and thereafter acts with reasonable diligence to cure the default.

(b) Either party may, at its option and in its sole and absolute discretion, elect to terminate this Agreement upon thirty (30) days prior written notice to the other party.

(c) This Agreement shall terminate automatically, without notice, upon the earliest of (i) the sale, transfer or other disposition of the Property; (ii) the dismissal or conversion of the Owner's bankruptcy case; or (iii) entry of an order of the Bankruptcy Court directing termination.

**2.4 Effect of Termination.**

Upon termination of this Agreement for any reason, including sale or any other event which results in Manager no longer managing the Property, Manager will surrender any space in the Property and remove any of Manager's personal property. Manager and Owner will account to each other for all outstanding matters under this Agreement, and Manager will deliver to Owner, at the Notice Address herein specified for Owner, unless other written instructions are received from Owner, the following:

(a) A final accounting, reflecting the balance of income, expenses, assets, and liabilities as of the Termination Date in form and substance mutually agreed by the parties within a mutually agreed upon timeframe.

(b) Any monies of Owner and/or tenant security deposits held by Manager with respect to the Property; however, to the extent that Manager has been granted the right and obtained consent of the secured creditors or authorization from the Bankruptcy Court to effect payment of its Management Fees, Specialty Licensing and Ancillary Income Commissions, Tenant Coordination Fees, and/or other amounts due Manager from funds of Owner, Manager shall have the right to withhold from such monies of Owner (but not from any security deposits) any such amounts then accrued and owing.

(c) All original records, contracts, leases, receipts for deposits, unpaid bills, and other documents pertaining to the Property in Manager's possession, provided that any such documents located at the Property will, unless Manager is otherwise directed by Owner, remain at the Property. The delivery of such original documentation will be at Owner's expense.

(d) If the Property website is hosted by Manager's website vendor, Manager will provide the registered domain names, for which, Owner maintains the ownership. Owner has sixty (60) days to transfer the website to another platform. If Owner fails to transfer the website within such sixty (60) day period, it will be decommissioned and neither Owner nor Manager will have any further access to it. In addition, if any consumer data related to the Property is maintained by Manager's data vendor, Manager will transfer all such data in a digital format (e.g., a Comma Separated Value file ("a .csv file") to Owner or other Owner-directed representative.

(e) Within ten (10) days after the Termination Date, a protected list (the "Protected List") indicating the following relating to the specialty licensing and ancillary income program all license agreements which Manager negotiated and fully executed prior to the Termination Date.

Upon any termination of this Agreement pursuant to the provisions of this Article 2, Owner will remain obligated to pay Manager the Management Fees, Payroll Reimbursement, Accounting Fee, Tenant Coordination Fees, Specialty Licensing and Ancillary Income Commissions due for the remainder of the applicable license term, and other amounts due Manager under this Agreement that accrued prior to the Termination Date. Owner may request Manager provide additional reporting or services for which Owner will pay Manager a mutually agreed additional fee of no less than $250 per hour. All bank accounts will be closed upon the Termination Date, or another date agreed by the parties, but in no event more than thirty (30) days thereafter.

**2.5 Pending Matters.**

In addition to any amounts payable to Manager during the term of this Agreement, for the Protected List tenants set forth in Section 2.4(e), Owner will be obligated to pay to Manager, on the Termination Date, all Specialty Licensing Commissions due and not previously paid, for the full term of the executed license agreement.

## ARTICLE 3. MANAGEMENT RESPONSIBILITIES

**3.1 Management.**

(a) Owner appoints Manager as the exclusive property manager for the Property, and Manager accepts such appointment on the terms and conditions set forth herein. Manager will have no right or authority, express or implied, to commit or otherwise obligate Owner or to encumber the Property in any manner whatsoever, except to the extent specifically provided herein.

(b) Manager, on behalf of Owner, will implement, or cause to be implemented, the decisions of Owner and will conduct the ordinary and usual business affairs of the Property, as provided in this Agreement. Manager will use diligent efforts to conform to all policies and programs established from time to time by Owner, as furnished in writing to Manager.

(c) Owner authorizes Manager, and Manager agrees, to generally do and perform, or cause to be done and performed, what is necessary, required or desirable in Manager's judgment for the proper and efficient management, operation, maintenance, and marketing of the Property and to faithfully and diligently render the services to be performed hereunder during the term hereof. Manager will act in a commercially responsible capacity with respect to the proper protection of and accounting for Owner's assets. Manager will deal at arm's length with all third parties, and, in doing so, Manager will serve Owner's best interests. A copy of the Manager's Management Standards in effect as of the date of this Agreement are set forth in Exhibit I attached hereto.

(d) Manager shall also provide the following sustainability services under this Agreement ("Sustainability Services"): (i) collection of energy, waste, and/or water data at the Property and tenant level, as required by authority having jurisdiction ("AHJ") mandated reporting (where submetering is not required and tenant data is reasonably accessible through tenant cooperation) and entering data into ENERGY STAR Portfolio Manager (or an equivalent, Owner preferred benchmarking tool) for benchmarking, which Manager shall maintain on a monthly basis, (ii) evaluation, presentation to Owner and implementation of basic and low-cost waste diversion opportunities, where available within the market in which the Property is located, through the local providers, (iii) assisting Owner with compliance with energy, waste, and/or water benchmarking and data reporting requirements for applicable AHJ that accept ENERGY STAR Portfolio Manager data, (iv) incorporating Manager's low cost/no cost sustainability practices into existing tenant engagement programs, (v) providing a Manager developed checklist of energy conservation best practices for a base building, (vi) performing, though on-site team to perform annual scorecard assessment of energy and sustainability maturity and best practice growth opportunities prior to preparing the annual budget and (viii) identification of standards and/or policies for green cleaning. Manager shall provide Sustainability Services at no additional cost to Owner hereunder, but to the extent that additional related services are required by Owner (including in connection with an AHJ mandated standards increase to include building certifications, "like building" benchmarking and other deliverables that require outside subject matter expert support), Owner will pay Manager a mutually agreed fee for such additional services. Notwithstanding anything provided in this Agreement to the contrary, Manager shall not be responsible for any costs for any environmental (including sustainability), social and governance matters at the Property, including costs associated with programs and activities at the Property that would require consultants, advisors, employee training and/or certification, and/or advanced data capturing and tracking software.

(e) At Owner's request, Manager can provide consulting services for portfolio-wide or property-level bidding on third party goods and services in designated managed service categories. In such event, the scope of such consulting services and fees payable to Manager will be negotiated on a case-by-case basis pursuant to a separate written agreement.

**3.2 Employees, Independent Contractor.**

Manager will have in its employ or contract for sufficient personnel to enable it to properly, adequately, safely and economically manage, operate, maintain and account for the Property. All matters pertaining to the selection, direction, employment, supervision, compensation, promotion and discharge of such personnel are the sole responsibility of Manager or Manager's subcontractor, as the case may be, which will be in all respects the employer of such personnel. Subject to Owner's reasonable approval, Manager will negotiate with any

union lawfully entitled to represent such employees and may execute on behalf of the Property collective bargaining agreements or labor contracts. Manager will have responsibility for and will fully comply with all applicable laws and regulations having to do with workers' compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other employer/employee related subjects. All costs of such personnel (including compensation, benefits, insurance, and taxes) will be reimbursable to Manager by Owner, as set forth in Article 8 of this Agreement. Unless otherwise agreed to in writing by the parties, in no event will any employee of Manager be required or requested by Owner to manage any property or project not listed on Schedule A.

**3.3 Schedule of Personnel.**

Manager will provide a schedule of personnel (in substantially the same form as Schedule B, attached hereto and made a part hereof) to be subject to Manager's exclusive control and employed in the direct management of the Property.

**3.4 Compliance with Laws, Agreements, etc.**

(a) Owner and Manager agree to cooperate with each other to cause the Property to be operated at all times in compliance with all applicable federal, state, and municipal laws, ordinances, regulations, and orders relating to the use, operation, repair, and maintenance of the Property ("Legal Requirements") and will not knowingly use the Property, or permit the use of the Property, in violation of such Legal Requirements. Notwithstanding the foregoing, it is recognized that Manager is not an expert in environmental laws and will not be responsible for remedying any violations of environmental laws. Owner will be solely responsible for remedying such violations, although Manager will assist and cooperate with Owner in connection therewith.

(b) Expenses incurred in complying with any Legal Requirements will be paid from the Operating Account (as defined below).

**3.5 Approved Operating Budget.**

Manager will prepare and submit to Owner a proposed operating budget for the promotion, operation, repair, improvement, and maintenance of the Property for the forthcoming year. The proposed budget will be delivered to Owner no later than sixty (60) days prior to the commencement of the fiscal year (which, unless otherwise specified by Owner, will be presumed to be a calendar year). If Manager is not the leasing agent for Property, Owner will direct its third-party leasing agent to provide leasing assumptions to Manager at least forty-five (45) days prior to Manager's deadline for submitting any budget to Owner. Owner will consider the proposed budget and will consult with Manager prior to the commencement of the forthcoming year in order to agree on an "Approved Operating Budget." If written approval or disapproval of the proposed budget has not been received by Manager by the first day of the fiscal year, Manager will, to the extent possible, continue to operate the Property subject to the budget in place for the prior year and will inform Owner of any budget items in excess of the prior budget that must be funded prior to agreement on the Approved Operating Budget. Manager agrees to use diligence and to employ reasonable efforts to ensure that the actual costs of maintaining and operating the Property do not exceed the total Approved Operating Budget. In the event Manager notifies Owner in writing of the need to increase any category or item within the Approved Operating Budget, and thereby increase the overall Approved Operating Budget, and Owner does not respond within fifteen (15) days of receipt of such notice, the increase shall be deemed approved by Owner, provided it does not affect more than a two percent (2%) increase in the total Approved Operating Budget; any larger increase requires Owner's explicit prior approval. Manager has the right to reallocate dollars among line items within the Approved Operating Budget without Owner's consent,

provided that such reallocation does not result in any diminution in the quality of services or materials provided by Manager to the Property.

If applicable, the Manager will purchase a budgeting software package (e.g. Kardin, Yardi ABF) for use at the Property. Since any efficiency improvements created by such a system are realized by the Property, the cost of purchasing, implementing and managing such budgeting software is a reimbursable operating expense as set forth in Section 8.2.

**3.6 Collection of Rents and Other Income.**

Manager will use diligent efforts to collect all rents and other income due Owner in accordance with the leases or as otherwise related to the Property. All such funds will be deposited in the lockbox associated with the Operating Account.

**3.7 Repairs.**

Manager will keep the Property and all parts thereof in a clean and sightly condition and will use diligent efforts to make and/or supervise all ordinary and extraordinary repairs, decorations, replacements, additions, alterations, and landscaping necessary or advisable in Manager's reasonable judgment for the proper operation of the Property and to comply with all applicable Legal Requirements, subject to the limits of the Approved Operating Budget and directions received from Owner.

Manager will secure Owner's prior written approval for any single repair expenditure greater than $15,000; however, in the event of an emergency, Manager may make expenditures for repairs that exceed the repair and/or budgetary limits without Owner's prior written approval if it is necessary to prevent damage or injury to persons or property. Owner will be informed of any such emergency expenditures before the end of the following business day.

**3.8 Supplies.**

Manager will purchase (using funds in the Operating Account) and provide all janitorial and maintenance supplies, tools, and equipment, restroom and toilet supplies, electrical supplies and light bulbs, boiler room supplies, paints, uniforms, stationery, and office supplies incident to performance of Manager's duties under this Agreement, except to the extent such supplies and materials are provided for by contract with a third party.

**3.9 Service Contracts.**

Manager is authorized to enter into contracts on behalf of Owner for the cleaning, maintenance, repair, or servicing of the Property (or any part thereof), as set forth in the Approved Operating Budget. All service contracts will: (a) be signed by Manager as agent for Owner; (b) be assignable, at Owner's option, to Owner's nominee; (c) with respect to any contract having a term of one (1) year or more, include a provision for cancellation by Owner upon not more than thirty (30) days written notice, unless such provision is waived by Owner; and (d) require that all contractors provide evidence of the insurance set forth below in Section 5.6. Manager will select vendors, other than as mutually agreed with Owner, in order to concentrate spending with preferred vendors to achieve improved pricing and to take advantage of established electronic payment processes as well as meet diversity and sustainability goals.

**3.10 Intentionally Omitted.**

**3.11 Tenant Coordination and CAD Services and Fees.**

If provided for on Schedule A of this Agreement, Manager will provide Tenant Coordination services consisting of managing and coordinating the planning, design of all tenant alterations and improvements to be performed at the property. Manager will (i) review plans and specifications for any authorized tenant construction for compliance with Property's design criteria; (ii) the property management team will monitor the progress of all tenant construction work for purposes of identifying potential delays, and inconsistencies with approved plans; (iii) where the tenant is performing such construction, the property management team confirm the date of substantial completion, the acquisition of all needed permits and licenses, and the completion of punch-list or corrective items. Manager will require evidence of insurance coverage consistent with each tenant's lease prior to commencement of any alterations or improvements. Progress reports will be provided to Owner from time to time or as requested by Owner. Manager will also manage any tenant alterations and improvements not provided for in tenant leases, provided that such alterations and improvements (x) are made at the tenant's expense in accordance with all applicable laws and ordinances, (y) do not affect the structure of the Property and do not unreasonably interfere with building services to other tenants, and (z) conform to the specifications and limitations of the Property. All of the foregoing services are hereinafter referred to as "Tenant Coordination Services."

In addition, if provided for on Schedule A of the Agreement, Manager will ensure the accuracy of tenant CAD files The foregoing services are hereinafter referred to as "CAD Services," which include maintenance and updates for tenant Lease Outline Drawings ("LODs") and creation of "What If Scenario" ("WIS") plans, including combining total or partial adjacent spaces. Owner must provide CAD files of the property to utilize the CAD Services for the property.

In consideration of Manager providing Tenant Coordination Services and CAD Services, Owner will pay to Manager the Tenant Coordination Fees and CAD Fees set forth on Schedule A. The Tenant Coordination Fees will be payable to Manager upon completion of the plan review. In the event Owner elects to use an architectural firm to provide the Tenant Coordination Services for the Property, all fees and expenses of such architect will be paid by Owner.

**3.12 Taxes, Mortgages.**

Manager will, if requested by Owner in writing and subject to either Bankruptcy Court order or consent of the Owners' secured creditors, pay bills for real estate and personal property taxes, improvement assessments, and other like charges from the Operating Account. At Owner's request, Manager will assist Owner in its efforts to reduce taxes and assessments attributable to, or payable for, the Property. Manager will forward a copy of such bills to Owner within a reasonable period of time after receipt thereof such that Owner may approve Manager's payment of such bills.

**3.13 Advances.**

Manager will not make any advance to or for the account of Owner or pay any sum other than out of Owner's funds held by or provided to Manager, as set forth in this Agreement, nor is Manager obligated to incur any liability or obligation for the account of Owner.

**3.14 Tenant Relations.**

Manager will enforce the provisions of all leases affecting the Property and promptly handle all complaints and requests from tenants. Unless otherwise directed by Owner, Manager will promptly serve a notice of default on any tenant that is not in full compliance with its lease obligations, with copies of such notices sent to Owner, and will work with such tenant(s) toward a cure of the default. Subject to Owner's prior

approval, Manager will pursue all claims against tenants, using counsel approved by Owner, and will not settle, compromise, or waive any such claim without Owner's prior consent. Manager will provide Owner with regular reports as to all tenant claims and litigation.

**3.15 Intentionally Omitted.**

**3.16 Lease Abstraction.**

No later than the Effective Date, Owner shall deliver to Manager the following lease documentation, as applicable, for the Property that is in the actual possession or control of the undersigned manager of the Owner: (i) lease and site plans, (ii) rent rolls, (iii) tenant statements, (iv) existing lease abstracts, and (v) original leases and amendments. Manager will rely upon the information contained in these documents as the current and correct representation of the lease terms at the Property. If requested by Owner, Manager will perform lease abstraction of the existing leases for a per abstract charge of $175, which amount may increase from time to time upon notice to Owner. Manager will provide lease abstracts in Manager's standard format, unless otherwise requested by Owner.

**3.17 Excluded Services.**

Notwithstanding anything to the contrary contained herein, the parties acknowledge that it is not within the contemplation of this Agreement or its fee structure that Manager perform any services with respect to the following (with the following list not intended to be exhaustive): abstracting existing leases or other tenant documents for the Property, the collection of extraordinary tenant receivables that accrued prior to the Commencement Date (unless addressed in Schedule A); the calculation and invoicing of tenants for rents or other charges that accrued prior to the Receiver Appointment Date; the preparation of budgets, forecasts, or any other financial projections for periods prior to the Receiver Appointment Date; accounting relating to the activities of an association, real estate easement agreement, or similar agreement; accounting and reporting for related entities or their operations; SOC audits or related reporting; obtaining a LEED or Green Globe certification for the Property; any substantial efforts in connection with due diligence or similar efforts relating to any financing, refinancing, or sale or disposition of the Property, including the production or pursuit of tenant estoppels or subordination and non-disturbance agreements, preparation of sale contract exhibits, copying and shipping of documents, and/or review of proposed sale or loan documents, except to the extent such services can be performed solely by the on-site Property personnel; zoning or site plan modifications for the Property; performing or supervising any extensive alteration or renovation of the Property; site acquisitions of additional grounds for the expansion of the Property or development of additional retail facilities; reconstruction relating to any proposed or implemented expansion of the Property or work generally classified as development work in connection with the same; development or significant capital project accounting; renewals or renegotiation of leases or other agreements with department stores involving substantial changes from existing documents (including negotiation of new leases, renewal leases, operating covenants, renovation provisions, expansion rights, and like matters); replacement of department store tenancies; and/or similar efforts relating to any development work. If Manager proposes or if Owner requests Manager to perform any of the foregoing services, prior to undertaking the performance thereof, Manager will submit to Owner for its approval a written proposal indicating the nature, extent, and cost, including Manager's fee and related payment provisions, for performing such work. Upon acceptance of such proposal, Owner shall pay Manager in accordance therewith.

**3.18 Environmental.**

Manager will (i) assist Owner in identifying and qualifying reputable, experienced experts to provide environmental consulting and testing services, as well as Hazardous Materials (as defined below) abatement, transportation, treatment, and disposal services ("Environmental Contractors"); (ii) together

with legal counsel designated or approved by Owner, prepare for signature by Owner service contracts with such Environmental Contractors; and (iii) coordinate the services provided by such Environmental Contractors. Owner expressly acknowledges that Manager is not in the business of providing environmental consulting or testing, or abatement, removal, treatment, transportation, or disposal of Hazardous Materials and asbestos; Manager's knowledge and expertise concerning such matters is that of a prudent manager; and Manager's services pursuant to this paragraph shall be subject to the standards of a prudent property manager of properties of similar age, type, size, use, and character as the Property.

"Hazardous Materials" means any toxic or hazardous wastes, pollutants, or substances, including asbestos, PCBs, petroleum products and by-products, substances defined or listed as hazardous substances or toxic substances or similarly identified in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. Sec. 9601 et seq., hazardous materials identified in or pursuant to the Hazardous Materials Transportation Act, as amended, 49 U.S.C. Sec. 5102 et seq., hazardous wastes identified in or pursuant to the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Sec. 6901 et seq., any chemical substance or mixture regulated under the Toxic Substance Control Act, as amended, 15 U.S.C. Sec. 2601 et seq., any toxic pollutant under the Clean Water Act, as amended, 33 U.S.C. Sec. 1251 et seq., any hazardous air pollutant under the Clean Air Act, as amended, 42 U.S.C. Sec. 7401 et seq., and any hazardous or toxic substance or pollutant defined and regulated under any other applicable federal, state or local environmental requirement.

**3.19 Delegation.**

Manager will have the right, from time to time, to delegate the performance of all or any portion of its services, duties and obligations under this Agreement to any affiliate of Manager. In such event, Manager will remain liable to Owner for the proper performance of the services, duties and obligations as required by this Agreement. The services described in this Agreement may be provided from one or more of Manager's global business services centers located outside the United States.

**3.20 Other Professional Services.**

From time to time, Manager may wish to propose offering additional professional services to Owner at the Property (including but not limited to LEED certification services, building condition or property assessments, energy and sustainability or building automation consulting, or other professional real estate services). In each case, Manager will provide Owner with a formal written proposal including a detailed scope of services, associated fees and expenses (each a "Proposal"). Upon Owner's written acceptance of each Proposal (for which the parties agree that an email constitutes acceptable written documentation), the Proposal will become part of and subject to this Agreement.

## ARTICLE 4. SPECIALTY LICENSING RESPONSIBILITIES AND COMMISSIONS

**4.1 Specialty Licensing and Ancillary Income.**

Manager will make diligent efforts to supplement the leasing and net operating income of the Property through a program of specialty licensing and ancillary income ("Specialty Licensing and Ancillary Income"), whereby license agreements are put in place with retailers and other users to occupy space in the Property in consideration of the payment of rent or other licensing fees, generally including a percentage of sales generated from their activity on the Property. These licenses will be used by Manager to meet seasonal marketing needs, fill short term in-line vacancies, and generate additional income for Owner. Manager will have the authority to enter into such license agreements for the Property as agent of Owner. In consideration

of Manager's efforts and in addition to reimbursement for Manager's personnel costs associated with the Specialty Licensing and Ancillary Income program, Owner will pay to Manager "Specialty Licensing and Ancillary Income Commissions" equal to the percent of the minimum and percentage rent collected pursuant to such license agreements set forth on Schedule A. The Specialty License and Ancillary Income Commissions shall be payable in arrears on the tenth (10th) day of the month following the end of the monthly accounting period.

**4.2 Specialty Licensing Template Agreements.**

Owner agrees to utilize Manager's standard Specialty License Agreement templates (the "Template Agreement(s)") for the contracting of space in the Property with licensees and other users. For efficiency, the Template Agreement(s) are generated via Manager's deal entry system and the format of such cannot be readily updated without technology and programming services. If Owner requests revisions to the Template Agreement(s) which result in an Owner-specific template, prior to undertaking the revisions, Manager will submit to Owner, for its approval, a written proposal indicating the nature, extent, and cost for performing such work. Upon acceptance of such proposal, Owner will reimburse Manager for all costs in the same manner as any other reimbursable cost set forth in this Agreement.

## ARTICLE 5. INDEMNIFICATION; INSURANCE

**5.1 Indemnification.**

To the extent permitted by law, Owner will indemnify, defend and hold Manager, and its affiliates, directors, officers, agents, and/or employees (collectively, "Manager Parties") harmless from and against any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, arising out of claims, demands or causes of action by third parties to which Manager Parties may become liable or subject in connection with the performance or nonperformance of Manager's duties and activities within the scope of this Agreement or arising from any action or activity on, or the condition of, the Property, except if and to the extent caused by or arising out of Manager's gross negligence or willful misconduct.

To the extent permitted by law, Manager shall indemnify, defend and hold Owner and its directors, officers, agents and/or employees (collectively, "Owner's Parties") harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, arising out of claims, demands or causes of action by third parties (except to the extent covered by any liability insurance required to be maintained by Owner with respect to the Property (without regard to any deductible or self-insurance retention amounts) pursuant to Section 5.2), sustained or incurred by or asserted against Owner by reason of or arising out of Manager's gross negligence or willful misconduct in connection with this Agreement.

**5.2 Owner's Insurance.**

Owner (or Owner may elect to participate in Manager's insurance program at Owner's written request and expense as long as the Property qualifies) will obtain and keep in force (i) insurance against physical damage for the full replacement cost of the Property and all of Owner's property contained therein, (ii) commercial general liability insurance, including contractual liability and personal injury coverages, insuring against liability for loss, damage, or injury to property or persons that might arise out of the occupancy, management, operation, or maintenance of the Property in amounts of not less than $1,000,000 each occurrence and $2,000,000 general aggregate, and (iii) excess or umbrella liability insurance of not less than $10,000,000 each occurrence and $10,000,000 aggregate. Manager will be insured as Owner's

real estate manager and Manager Parties will be named as additional insureds in all liability insurance maintained with respect to the Property. All such liability policies shall be primary and non-contributory with any liability insurance carried by Manager Parties with respect to any claims arising out of the performance or non-performance of Manager's duties and activities within the scope of this Agreement or arising from any action or activity on, or condition of, the Property. The insurance companies issuing such insurance shall have an AM Best rating of not less than A-VII. Manager shall be furnished a certificate evidencing such insurance, which certificate shall provide that the insurer will deliver to Manager written notice of policy cancellation in accordance with Owner's insurance policy provisions. Manager agrees to notify Owner promptly after Manager receives actual notice of any such loss, damage or injury. Manager shall reasonably aid and cooperate with Owner with respect to such insurance and any loss thereunder. All property damage and business interruption or rent loss insurance policies shall contain appropriate clauses pursuant to which the respective insurance carriers shall waive all rights of subrogation with respect to losses payable under such policies; and Owner waives any claims against Manager Parties that would normally be covered by any such insurance, including any deductibles, co-insurance, or self-insurance retentions, irrespective of the cause thereof.

**5.3 Tenant Insurance.**

Owner shall cause its leases with tenants to include Owner and Manager Parties as indemnitees and contain the insurance requirements set forth below:

(i) General Liability Insurance shall be primary and non-contributory. Owner and Manager Parties shall be included as additional insureds under the tenant's policy.

(ii) Tenant and tenant's insurers shall waive all rights of subrogation against Owner and Manager Parties for any claim or damage at the Property.

**5.4 Development and Project Management Insurance.**

When Manager is providing Development and Project Management Services in accordance with Section 3.10, the following additional insurance requirements shall apply:

Owner shall exert commercially reasonable efforts with assistance from Manager, to have its contract with the general contractor for capital improvements per Section 3.10(a) name Owner and Manager as indemnitees and contain the following insurance requirements as respects claims arising from the capital improvement:

(i) Commercial General Liability insurance in the amount of $10,000,000. This policy shall be primary and any commercial general liability insurance carried by Owner or Manager shall be non-contributory. Both Owner and Manager shall be named as additional insureds under the general contractor's policy. (ii) Builders' Risk insurance on the material and labor that become part of the project. The coverage shall be replacement value and the general contractor for the capital improvement and their insurer shall waive any rights of subrogation against Owner and Manager. (iii) Companies with which the insurance is placed shall have received an A.M. Best's rating of A-VII or better. The insurance certificates shall provide that the insurer will give Owner and Manager thirty (30) days written notice prior to policy cancellation or non-renewal of the applicable insurance.

**5.5 Manager's Insurance.**

Manager will maintain (i) commercial general liability insurance, including contractual liability and personal injury coverages, having limits of liability of $1,000,000 each occurrence and $2,000,000 general

aggregate, (ii) excess or umbrella liability insurance having limits of liability of $10,000,000 each occurrence and $10,000,000 aggregate, (iii) crime insurance having a limit of $2,000,000, (iv) professional liability having limits of $1,000,000 per claim and $2,000,000 annual aggregate, (v) cyber liability having limits of $1,000,000 per claim and $2,000,000 annual aggregate and (vi) worker's compensation insurance in the statutory amount (or participate in the appropriate state fund if such insurance is not available or allowed) and employers liability insurance having limits of $1,000,000. The insurance companies issuing such insurance shall have an AM Best rating of not less than A-VII. Manager shall furnish to Owner certificates evidencing such insurance, which shall provide that the insurer will endeavor to provide Owner written notice of policy cancellation in accordance with Manager's insurance policy provisions.

**5.6 Contractors' Insurance.**

Manager shall obtain and keep on file a certificate of insurance for each vendor hired by the Owner to perform services at the Property.

Owner shall cause any contractor to provide the following:

1. Manager's Parties named as additional insureds on a primary and non-contributory basis on the Commercial General Liability (CG 2010 04/13 and CG 2037 04/13, or their current equivalents, must be utilized), Automobile Liability and Umbrella/Excess policies; and

2. Provide a waiver of subrogation on contractors' workers' compensation and property damage insurance policies.

## ARTICLE 6. FINANCIAL REPORTING AND RECORDKEEPING

**6.1 Books of Accounts.**

Manager will maintain adequate and separate books and records for the Property, the entries to which will be supported by sufficient documentation to ascertain that said entries are properly and accurately recorded to the Property. Such books and records will be maintained by Manager at the Property, at Manager's office, or at such other location as may be mutually agreed upon by the parties.

**6.2 Account Classification.**

Manager will utilize its chart of accounts for the Property, unless directed otherwise by Owner.

**6.3 Financial Reports.**

Manager will furnish summary reports, as described on Schedule C attached hereto, in a form acceptable to Owner, of all transactions occurring between the first day and the last day of the prescribed monthly accounting period. These reports are to be delivered to Owner reasonably promptly after the end of the accounting period on a monthly basis, and in no event later than the 15th of the following month, and will show all collections, delinquencies, uncollectible items, and other matters pertaining to the management, operations, and maintenance of the Property during the prescribed monthly accounting period. In addition, Manager, upon Owner's written request and, with reasonable notice, may prepare such other reports as Owner may require or desire. However, Manager is not required to produce such reports if doing so will require significant or unreasonable effort on Manager. Any additional costs incurred by Manager to provide such additional reporting will be reimbursed by Owner. If Owner does not object to the annual financial statements for any year within one (1) year after receipt thereof, such statements will be deemed conclusive

and binding on Owner, and Owner may not thereafter object to the financial statements or any item therein for such year.

Manager will not be responsible for the preparation of any forms, reports, or income or other tax returns required to be filed or prepared on behalf of Owner in connection with the Property by any local, state, federal, or other governmental authority, other than personal property and sales tax reports, if requested by Owner in writing. In addition, Manager will not be responsible for any reporting of ownership-level activity or transactions. Notwithstanding anything to the contrary contained in this Agreement, Manager will not bear any responsibility for the accuracy of financial or other information provided by Owner, any prior manager, or any third party not under Manager's direct control, nor will Manager be liable to Owner for damages or losses resulting therefrom. Manager will also not bear any responsibility for reporting to lenders or other third parties on behalf of Owner. In the event that Owner directs Manager to maintain books and records on Owner's accounting systems, Owner takes full responsibility for any deficiencies in internal controls arising from access levels to its accounting system that are not in keeping with Manager's policies and procedures. Owner agrees to reimburse Manager for any costs associated with providing remote access to Owner's accounting systems for Manager's regional accounting personnel. Owner will pay Manager a mutually agreed fee for any agreed upon additional reporting that is not initially reflected on Schedule C. Notwithstanding anything provided in this Agreement to the contrary, the following services shall not be provided by Manager under this Agreement: (i) asset or fund level accounting, (ii) direct engagement with external auditors, (iii) directly reporting to Owner's banks, lenders or taxing authorities, (iv) reporting to Owner affiliates or other related entities, including associations.

**6.4 Supporting Documentation.**

As additional support to the monthly financial statements, Manager shall keep and make available to Owner upon its request:

(a) All bank statements, bank deposit slips, and bank reconciliations,

(b) Detailed cash receipts and disbursement records,

(c) General ledger listings, including transaction level detail, and

(d) All invoices.

**6.5 Accounting Principles.**

All financial statements and reports required by Owner will be prepared utilizing cash basis accounting.

**6.6 SOC Audits.**

Manager shall not be required to provide Owner with a SOC 1 audit report of any type on Manager's description of its system and the suitability of the design and operating effectiveness of its controls or a SOC 2 audit of any type designed to evaluate an organization's information systems that are relevant to security, availability, processing integrity, confidentiality or privacy.

**6.7 Accounting System.**

Manager shall promptly and accurately enter all accounting, financial and lease administration data into the Manager-managed Yardi financial management system ("JLL Yardi") for accounting transactions and reporting. Owner shall provide to Manager the opening accounting entry information, including building

valuation, land building split (if applicable), trial balance (balance sheet and P&L), security deposit listings, open accounts payable, open accounts receivable, 1099 data for calendar year and other requirements as mutually agreed. Manager will perform the client accounting services in accordance with the financial criteria agreed between the parties (the "Accounting Services"). If a conversion from Owner's existing accounting system ("Legacy System") to JLL Yardi is necessary (the "Conversion"), Owner will provide the required data at least thirty (30) days prior to the go-live date for JLL Yardi for an individual Property and ninety (90) days for multiple Properties. Owner shall reimburse Manager for any costs and expenses incurred by Manager in connection with the Conversion. Yardi license fees incurred by Manager or Owner will be charged to the applicable Property, as applicable. In the event Owner does not use JLL Yardi and instead uses a Legacy System, Manager will require all necessary software licenses to ensure efficient operations and adequate segregation of duties. Owner will pay for or reimburse Manager for any such Legacy System software licenses. Manager shall not be responsible for any costs or delays associated with the use of a Legacy System, including (i) timing of recording tenant receipts or (ii) Legacy System control deficiencies, including lack of adequate access to align with Manager controls.

## ARTICLE 7. BANK ACCOUNTS

### 7.1 Operating Account.

A separate and exclusive operating account with lockbox service (the "Operating Account") for the Property will be opened with a name and in a bank designated by Owner, provided, that such financial institution, if possible, will be setup in a bank within Manager's banking network (a "JLL Network Bank") and any bank accounts shall be controlled by Manager. If Owner does not use a JLL Network Bank then Owner agrees it shall, (i) designate five (5) signers from Manager on such bank accounts, (ii) provide Manager the requisite administrative access to the account(s) within sixty (60) days of Manager's request, (iii) if applicable, implement a Manager facsimile signature plate on Owner's systems within sixty (60) days of Manager's request, (iv) establish fraud protection services ("Positive Pay") on the account(s) providing Manager with administrative access, as required, and reimburse Manager for any associated fees incurred and (v) remain responsible for the control framework, including fraud mitigation, associated with the use of a financial institution that is not a JLL Network Bank. Owner will reimburse Manager for any associated fees or costs for transacting with any financial institution, including a JLL Network Bank. Manager will deposit all rents and other funds collected from the operation of the Property, including any and all advance rents, into the Operating Account, from which it will also pay the operating expenses of the Property and any other payments relative to the Property, as required by the terms of this Agreement. If more than one account is required to operate the Property, each account must have a unique name. Owner will pay for bank fees associated with all accounts maintained to operate the Property. Manager will be relieved of its obligations hereunder to the extent Owner does not provide sufficient funds for Manager to perform them.

As soon as practical, Manager will introduce an Electronic Invoice Presentation (EIP) system to manage accounts payable at the Property. Since any efficiency improvements created by such a system are realized by the Property, the cost of implementing and managing an EIP system, which is estimated at an amount not to exceed $2.50 per invoice, is to be reimbursed through the Operating Account pursuant to Section 8.2. Manager will pay vendors and third parties electronically when such payees are enrolled for electronic payments and either the Owner's bank accounts are setup for electronic payments or Owner is using a JLL Network Bank. In the event electronic payments are not possible for such payments, then Manager will send such payments via (i) paper checks; provided (a) no second approver will be required for payments less than $500,000, (b) no "wet" signature requirements except for payments greater than $500,000, (c) check payments will be made via Manager's payment platform, which may be outsourced to a third party provider, and (d) Manager will be reimbursed by Owner in the amount of $10.00 per paper check issued plus shipping fees, or (ii) wire transfers; provided, (a) Manager will be reimbursed by Owner in the amount of $50 per wire

transfer and (b) no same day first time wires will be permitted, unless Manager has performed its customary controls and verifications. Owner shall enroll in Manager's P-Card program at each Property for point-of-sale payments.

**7.2 Transfer of Funds.**

On the last day of every prescribed monthly accounting period, Manager will remit to Owner a percentage, to be determined by Owner, of the cash balance in the Operating Account after deducting the authorized working capital amount, which authorized working capital amount equals the sum of (i) the estimated amount of the operating expenses for the next prescribed monthly accounting period and (ii) known expenditures of the prescribed monthly accounting period. Notwithstanding anything provided in this Agreement to the contrary, Owner shall provide Manager a schedule outlining the deliverables for the payment of monthly distributions based upon funds available to Owner required outside of the standard distribution schedule.

**7.3 Segregation of Accounts.**

In each instance where Manager manages several properties for Owner, Manager shall, at Owner's request, segregate the income and expenses of each property so that gross income from each property will be applied only to the bills and charges relating to that property.

**7.4 Security Deposit Account.**

Where the law requires that tenant security deposits be separately maintained, a separate account will be opened by Manager at a bank approved by Owner and will be maintained in accordance with applicable law. Such account will be used only for maintaining tenant security deposits. The name of the account shall be designated by Owner in writing.

Manager will maintain detailed records of all security deposits deposited in such account, which will be open for inspection by Owner's employees or appointees. Manager will comply with all statutory requirements, if any, relating to the return of security deposits.

**7.5 Change of Banks.**

Owner may direct Manager from time to time to change a depository bank or the depository arrangements.

## ARTICLE 8. PAYMENT OF EXPENSES

**8.1 Manager's Personnel Costs.**

Manager will be reimbursed out of the Operating Account, the monthly Payroll Reimbursement set forth on Schedule A which is applicable to all personnel identified on Schedule B. Such reimbursement will be due no later than the first day of each month and will be made through an ACH Electronic Funds Transfer or other such electronic payment method.

**8.2 Payment from Operating Account.**

Manager will pay from the Operating Account all expenses properly incurred by Manager pursuant to this Agreement, set forth in the Approved Operating Budget, or otherwise approved by Owner in writing after obtaining Court authorization to use cash or the consent of the secured creditors, including the following expenses:

(a) Costs to correct any violation of Legal Requirements,

(b) Actual and reasonable costs of making all repairs, replacements, additions, decorations, and alterations,

(c) Costs incurred by Manager in connection with all service agreements and property agreements,

(d) Costs of collection of delinquent rentals, whether collected through a collection agency or other third party approved by Owner,

(e) Legal fees of attorneys approved by Owner,

(f) Costs of capital expenditures made pursuant to the Approved Operating Budget,

(g) Costs of printed checks for each bank account required by Owner and printed forms and supplies required for use at the Property,

(h) Leasing commissions due to tenant brokers,

(i) Costs of advertising and promotional materials,

(j) All compensation payable to Manager pursuant to this Agreement, including, but not limited to, Management Fees, Accounting Fee, Payroll Reimbursement, Specialty Licensing and Ancillary Income Commissions and Tenant Coordination Fees,

(k) Utility costs,

(l) Insurance costs (except premiums for insurance Manager is obligated to maintain at its expense under Section 5.3 hereof),

(m) Costs of supplies purchased pursuant to Section 3.8,

(n) Intentionally Omitted

(o) Travel for Manager's senior management and technical services personnel, not listed on Schedule B, providing services directly related to the Property, subject to approval and reasonableness,

(p) Costs of Manager's accounting services provided to the Property, set forth as the "Accounting Fee" on Schedule A,

(q) Reasonable compensation and expenses, including travel costs, of Manager's home office or other staff related to the takeover of the Property and hiring of on-site staff,

(r) Costs of employees employed by Manager in accordance with Sections 3.3 and 8.1 hereof, set forth as the "Payroll Reimbursement" on Schedule A,

(s) Intentionally Omitted

(t) Cost of licenses, implementation and maintenance related to technology products utilized at the property including, but not limited to, the tenant emergency notification system, Jones automated insurance certificate tracking system for tenants and vendors, Manager's EIP System and any budgeting and accounting software, as set forth in the Approved Operating Budget, and

(u) Cost of Business License(s) which Manager must secure on behalf of Owner related to the Property as required by City, County or State agencies.

**8.3 Non-reimbursable Costs.**

The following expenses or costs incurred by or on behalf of Manager in connection with the management of the Property will be at the sole cost and expense of Manager and will not be reimbursed by Owner:

(a) Costs of gross salaries and wages, payroll taxes, insurance, workers' compensation, and other benefits of Manager's personnel, except as provided on Schedule B and in Sections 3.3 and 8.1 hereof, unless set forth in the Approved Operating Budget, or otherwise approved by Owner,

(b) Costs of insurance required to be maintained by Manager at its own expense or purchased by Manager for its own account,

(c) Costs of forms, stationery, ledgers, and other supplies and equipment used at Manager's home office, except such items as may be used exclusively for the benefit of the Property or Owner, and

(d) Costs of travel for Manager's home office personnel, except as provided in Schedule A hereof, unless specifically approved by Owner or included in the Approved Operating Budget.

**8.4 Insufficient Gross Income; Priorities.**

If at any time the cash flow from any Property shall not be sufficient to pay the bills and charges which may be incurred with respect to such Property, or if such cash flow is insufficient to pay the combined sum of both bills and charges, Manager shall first be entitled to receive any outstanding Payroll Reimbursement, Management Fees, Specialty Licensing and Ancillary Income Commissions, Tenant Coordination Fees, Accounting Fee and any other amounts due Manager. Thereafter, Manager shall consult with Owner in order to determine the priority for payment of all remaining bills and charges. Manager shall promptly submit to Owner a statement of all remaining unpaid bills in order to determine the appropriate action to be taken.

## ARTICLE 9. OWNER'S RESPONSIBILITIES

**9.1 Office and Equipment.**

Unless Manager and Owner mutually agree that an onsite office is not reasonably necessary in order for Manager to properly perform its duties and obligations under this Agreement, Owner will, at its expense, provide to Manager suitable first-class space constructed and furnished in a manner consistent with the image and marketing of the Property, including any equipment and office furnishings, in order for Manager to properly fulfill its duties and obligations under this Agreement with respect to the Property. Manager shall not be required to pay rent for such space, nor to pay for any utilities, fixtures, telephone, furniture, or equipment used therein, provided that any improvements or additions thereto are approved by Owner or included in the Approved Operating Budget.

**9.2 Payment of Taxes and Amounts Due under Property Agreements.**

(a) Owner, at its option, may directly pay all taxes, special assessments, ground lease rental, insurance premiums, and mortgage payments due for the Property. Unless and until Owner specifically requests that Manager make any such payments and provides Manager with adequate information and documentation to do so, it will be presumed that such payments are being made, and related relationships handled, by Owner. If Owner requests that Manager make such payments, Owner will ensure the necessary funds are available within ten (10) business days in advance of projected issuance of payment.

(b) Owner will be responsible for all taxes due and payable on any payments to Manager hereunder, including any sales tax, value-added tax, or gross receipts tax; however, in no event shall Owner be responsible for any net income or franchise tax assessed against Manager.

**9.3 Non-Solicitation of Employees.**

Except for Manager's employees based at the Property who work solely for the benefit of the Property, Owner agrees not to, directly or indirectly, attempt to persuade or solicit any employee of Manager to terminate their employment with Manager, and agrees not to hire any employee of Manager while such employee is employed with Manager and for a period of one (1) year after termination of such employment, including engaging such employee or former employee as an independent contractor or as an employee of any person other than Manager or any affiliate of Manager. In addition to all other remedies available to Manager, because the parties acknowledge the difficulty of calculating actual damages for a breach of this provision, Owner agrees to pay Manager, as liquidated damages and not as a penalty, the sum of $100,000 for each employee hired directly or indirectly by Owner or any other person in violation of this Section 9.3.

## ARTICLE 10. SALE OF THE PROPERTY

**10.1 Cooperation with Owner.**

Subject to the terms of Section 3.17, Manager will reasonably cooperate with Owner in support of Owner's obligations regarding due diligence under a purchase and sale agreement relative to the sale of the Property. Manager will only act pursuant to written direction from Owner, its representatives or agents, and Owner will take sole responsibility for compliance with its obligations under any purchase and sale agreement. Owner will provide Manager with the necessary and appropriate guidance and direction with regard to any due diligence efforts related to the Property.

## ARTICLE 11. COOPERATION

**11.1 Cooperation.**

Should any claim, demand, suit or any other legal proceedings be made or instituted by any person against Owner, which arise out of any of the matters relating to this Agreement or out of any matters relating to Manager's other obligations to Owner or to third parties, Manager shall give Owner, upon Owner's request, all pertinent information and reasonable information in the defense or other disposition thereof. Manager shall notify Owner within a reasonable period of time given the circumstances of any fire, material accident or other casualty, condemnation proceedings, rezoning or other governmental order, lawsuit or threat thereof involving the Property and violations relative to the use, repair and maintenance of the Property under governmental laws, rules, regulations, ordinances, or like provisions. Manager will not bear responsibility for

noncompliance of the Property and Manager shall be entitled to receive from Owner reasonable fees and the expenses incurred by off-site staff in connection with any such cooperation or incurred in assisting Owner following the expiration or termination of this Agreement. Owner shall similarly cooperate with Manager should any claim, demand, suit or other legal proceedings be made or instituted by any person against Manager which arise out of any of the matters relating to this Agreement.

## ARTICLE 12. COMPENSATION

**12.1 Compensation.**

Manager will receive compensation in accordance with Schedule A. All compensation will be paid to Manager from the Operating Account for the Property through an ACH Electronic Funds Transfer. Manager will be entitled to receive its Management Fee on the pro rata portion of rents received by Owner after the termination of this Agreement but applicable to time periods prior to the termination, unless post-closing accounting services are requested by Owner, in which case, Manager will be entitled to receive its Management Fee (or a pro rata portion thereof) for the duration of such services.

## ARTICLE 13. NOTICES

**13.1 Notices.**

All notices, demands, consents and reports provided for in this Agreement must be in writing and given to Owner or Manager at the address set forth below or at such other address as they may thereafter specify in writing:

OWNER:

Ramanujan Group LLC
c/o Howard Grobstein, Grobstein Teeple LLP
6300 Canoga Ave. #1500W
Woodland Hills, CA 91367

With a copy to:

Kyra Andrassy
Raines Feldman Littrell LLP
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
kandrassy@raineslaw.com

MANAGER:

Jones Lang LaSalle Americas, Inc.
3344 Peachtree Road NE
Suite 1200
Atlanta, GA 30326
Attention Retail Documents

With a copy to:

Jones Lang LaSalle Americas, Inc.
200 East Randolph Drive
Chicago, IL 60601
Attention: Chief Counsel - Retail

Address for receipt of payments:

Jones Lang LaSalle Americas, Inc.
P.O. Box 95028
Chicago, IL 60694-5028
Attn: Billing for ***Blackhawk Plaza***

Such notices or other communications may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited at a United States Post Office or a depository for the receipt of mail regularly maintained by the Post Office. Such notices, demands, consents, and reports may also be delivered by hand or by nationally recognized overnight courier service. For purposes of this Agreement, notices will be deemed to have been given upon receipt or rejection of receipt, whether given by personal delivery, overnight courier service, or the United States mail, as provided above.

## ARTICLE 14. GENERAL PROVISIONS

**14.1 No Assignment.**

This Agreement, and all rights hereunder, is not assignable by either party hereto (except as may be required by a surety company in a matter of subrogation and to any party holding a first mortgage lien on the Property), except that Manager may assign this Agreement or any of its duties hereunder to any affiliate of Manager or any entity that acquires all or substantially all of Manager's assets through a merger, consolidation or otherwise.

**14.2 Pronouns.**

The pronouns used in this Agreement referring to Owner and Manager shall be understood and construed to apply whether Owner or Manager be an individual, partnership, corporation, or individual or individuals doing business under a firm or trade name.

**14.3 Amendments.**

Except as otherwise herein provided, any and all amendments, additions, or deletions to this Agreement must be in writing and signed by the parties.

**14.4 Headings.**

All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

**14.5 Survival.**

In addition to the provisions of this Agreement which, by their nature, are intended to survive, the provisions of Articles 5, 8, 12, and 13 and Sections 2.3, 2.4, 2.5, 9.3, 14.6, 14.7, 14.9, 14.10 and 14.11 of this Agreement will survive the expiration or termination of the term of this Agreement.

**14.6 Delinquent Payments.**

Delinquent payments hereunder will earn interest, at the rate of the lesser of (i) one-and-one-half percent (1 ½%) per month or (ii) the maximum rate permitted by law, from the date due until paid.

**14.7 Limited Liability.**

Neither party will be liable to the other for, and each party hereby waives any and all rights to claim against the other party, any special, indirect, incidental, consequential, punitive, or exemplary damages in connection with this Agreement, including, but not limited to, lost revenue or profits, even if a party has knowledge of the possibility of such damages. In no event will Manager's liability to Owner hereunder

exceed $500,000. The preceding monetary cap on Manager's liability will not apply to third-party claims for bodily injury or property damage or claims arising out of Manager's fraud or gross negligence.

**14.8 Copies of Agreement; Signatures.**

The parties agree that an electronic signature will be considered an original signature; a copy of the fully executed Agreement will be considered an original instrument; each, together or separately, will be binding and enforceable as if an original; and the parties may rely on the same to prove the authenticity of this Agreement. This Agreement may be executed in one or more counterparts, each of which will be considered an original instrument, but all of which will be considered one and the same agreement and will become binding when one or more counterparts have been signed by each of the parties and delivered to the other party.

**14.9 Attorneys' Fees; JURY WAIVER.**

If either party shall institute any action or proceeding against the other relating to the provisions of this Agreement, the unsuccessful party in the action or proceeding will reimburse the prevailing party for all reasonable expenses, attorneys' fees, and disbursements. THE PARTIES HEREBY WAIVE TRIAL BY JURY.

**14.10 Governing Law; Jurisdiction.**

This Agreement will be governed by the laws of the state where the Property is located, without regard to any conflict of law principles. Any litigation regarding this Agreement will take place in the U.S Bankruptcy Court, Central District of California, Santa Ana Division, where the Owner's bankruptcy case is pending.

**14.11 Confidentiality; Publicity.**

Manager shall keep confidential all non-public information obtained from Owner relating to its services under this Agreement, except as reasonably required in order to perform such services, for the term of this Agreement and for two (2) years after the expiration or termination of this Agreement. In addition, any and all data and studies created specifically for the Property in connection with Manager's services shall belong to Owner. Owner agrees that Manager may publicize its role in any transaction Owner enters into, provided Manager does not disclose any financial information regarding such transaction.

**14.12 Non-Discrimination.**

The parties hereto acknowledge that it is illegal to refuse to display, lease, or sell to or from any person because of one's membership in a protected class, e.g., race, color, religion, national origin, sex, ancestry, age, marital status, physical or mental handicap, familial status, or any other protected class, and agree not to discriminate unlawfully against anyone in a protected class.

**14.13 Authorization.**

The individual executing this Agreement personally certifies and warrants that he or she is duly authorized to sign this Agreement and that by his or her execution hereof, this Agreement will be legally binding and enforceable.

**14.14 OFAC.**

Owner represents and warrants that neither it nor any of its employees is a person or entity with whom U.S. entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action.

**14.15 Information.**

Subject to each party's obligations of confidentiality hereunder, nothing in this Agreement will prevent Manager from using information of Owner in an anonymized and de-identified data format in combination with other data in order to create benchmarks, performance curves and similar statistical devices or data which may be shared with other clients of Manager.

**14.16 Complete Agreement.**

This Agreement, Exhibit I and Schedules A, B and C attached hereto and by this reference made a part hereof constitute the entire agreement between the parties with respect to the activities noted herein and supersede and take the place of any and all previous discussions and agreements between the parties hereto relating to the Property.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date written below.

RAMANUJAN GROUP, LLC

By: Signed by: Howard Grobstein
468FC6C9A58046E...

Name: Howard Grobstein
Title: Manager
Date: 10/29/2026

JONES LANG LASALLE AMERICAS, INC.

By: Signed by: Scott Michaelis
1DF8D13BFB104DC...

Name: Scott Michaelis
Title: Managing Director
Date: 10/29/2026

# EXHIBIT I

## MANAGER'S MANAGEMENT STANDARDS

### JLL Property Management Standards

**Core Practices**
Our Core Practices are the national programs that define and form the foundation of the JLL management product for all clients, our management teams, and our tenants. Consistent execution of the Core Practices ensures that we deliver the level of quality and efficient performance that we commit to our clients when they entrust their properties to us.

**Property Management Portal (PM Portal)**
Our Core Practices are delivered to our teams via our PM Portal; a web-based and app-accessible digital platform to support internal teams in the delivery of consistent and efficient best-in-class services at our managed sites. The PM Portal is also used by leadership to quickly disseminate important information and news to all team members across the country.

**Management Compliance Excellence Program**
Anchoring our Core Practices is our internal quality assurance program, the Compliance Excellence Program (CEP). The CEP is a quarterly assessment of property management compliance around our risk mitigation policies and ensures best practice implementation at all our sites. This program reviews risk mitigation practices, accounting controls, contract terms, and key performance metrics to provide a system of checks and balances to ensure alignment with internal protocols, best practices, and the latest developments in property management.

**Engineering Services Operational Compliance Program**
The Operational Compliance Program (OCP) is our annual comprehensive program to monitor property compliance with applicable codes, laws, regulations, and JLL property operations standards. The OCP provides our client's real peace of mind knowing occupants are safe and properties are code compliant. The OCP is unique in our industry and supports our Engineering Services safety record which is three times better than the industry average.

**StartSMART Property Onboarding**
This program provides a comprehensive standard for management assignment on-boarding and ensures the successful transition of properties to JLL. Delivered by our Onboarding Solutions Team, the program provides direction and support around key on-boarding processes related to personnel, operations, equipment, administration, and much more. This process ensures the professional on-boarding of assignments to ease the stress of teams and clients and mitigates risk by ensuring that all client and JLL requirements are met pursuant to the management agreement.

**EndSMART Disposition Program**
A comprehensive standard process for management assignment disposition. This program provides direction and structure around key close-out processes related to personnel, systems, records, and equipment as well as ensures the professional closing of an assignment for both the client and JLL.

**Emergency Preparedness**
In Case of Crisis (ICOC) is our app-based emergency response platform that provides property teams a solid foundation using JLL's proprietary 4Sight plans to create site specific emergency response programs that protect the asset for our clients. Our crisis and emergency response programs are strongly focused on

the four components of emergency preparedness: planning, communications, compliance, and preparedness.

**Financial Accounting Process Assessments**

A combination of training and testing to improve management personnel's skills in the following areas: accounts payable, lease administration, cash management, tenant billing, cash application, financial reporting, escalations, and variance explanations. Utilizing an accounting and property team roles and responsibilities matrix, we ensure effective and consistent workflows around our financial operations, performance, and management.

**Learning and Development**

Our Core Practices are supported by our robust and personalized learning resources, annual leadership conferences, and outside continuing education programs that solidify JLL's commitment to having the best trained, supported, and enabled employees in the industry. Employees have access to our library of over 15,000 online e-learning courses via MyLearning (JLL's learning and development platform) and LinkedIn Learning, as well as roles-based training curriculums and professional live training classes.

**SharePoint Business Continuity**

All sites are housed on the secure/password protected JLL server/cloud and backed-up and saved on a daily basis to ensure continuity and preservation of records. All document folders and files are set up using our standard filing protocols and maintained in compliance with our file retention policies. These secure digital sites support our sustainable practices, mitigate risk, and ensure document retention for our client and JLL.

**Sustainability Commitment**

By leveraging sustainable real estate practices in our programs and services, we maximize sustainable operations at the property level. The foundation of our sustainable operations ensures property data reporting compliance with applicable codes and regulations, energy scorecard assessments and conservation best practices, waste diversion measures, sustainability focused tenant engagement activities, and green cleaning standards. JLL is committed to reducing our carbon footprint, conserving raw materials and energy, monitoring and improving environmental performance, and collaborating with our clients to promote environmental stewardship.

# SCHEDULE A

## PROPERTY DESCRIPTION AND MANAGER'S COMPENSATION

I. NAME AND ADDRESS OF PROPERTY:

**Blackhawk Plaza, 3380 Blackhawk Plaza Circle, Danville, California 94506**

II. MANAGER'S COMPENSATION:

**Management Services**

| Service | Fee |
|---|---|
| **Management Fee** | $10,000 per month, payable on the first day of each month of the Term (the "Management Fee"). |
| **Payroll Reimbursement** | $10,000 per month, payable on the first day of each month of the Term (the "Payroll Reimbursement") |
| **Accounting Fee** | $3,000 per month, payable on the first day of each month of the Term (the "Accounting Fee") |
| **Specialty Licensing/ Ancillary Income** | 20% of the specialty licensing and ancillary income revenues collected.<br><br>Reimbursable Expenses: All out-of-pocket expenses, if any, directly related to negotiating licenses and all travel for specialty licensing professionals. The Owner has the right to approve all expenses before they are incurred and agrees to approve on a timely basis. |
| **Plan Review and Tenant Coordination** | ▪ $7,500 for a restaurant review<br>▪ $6,500 for retail spaces of 10,000 square feet or more<br>▪ $5,000 for retail spaces less than 10,000 square feet<br>▪ $500 new sign review |
| **CAD Services** | $3,000 set-up fee<br>$400 per month, payable in advance on the first day of the month. |

| Service | Fee |
|---|---|
| **Reimbursable Expenses** | Owner will reimburse Manager for travel to the Property by the Regional Manager(s), as addressed in Section 8.2.<br><br>Lease abstracting, if requested by Owner as set forth in Section 3.16 of the Agreement. |

# SCHEDULE B

## PROPERTY PERSONNEL

Property Manager
Operations Manager
Bookkeeper

All costs related to the aforementioned Property Personnel are incorporated into the Monthly Payroll Reimbursement set forth on Schedule A. There are no additional reimbursements due to Manager, unless agreed to, in writing, by both parties.

## SCHEDULE C

## FINANCIAL REPORTS

- Income Statement with Variance Explanations
- Trial Balance – YTD Activity
- Trial Balance – Monthly Activity
- Balance Sheet
- Bank Reconciliations/Bank Statements
- Check Register
- Accounts Receivable Aged Delinquent/Reconciliation Report
- Management Fee Calculation
- Balance Sheet Supporting Schedules (as required)
- Rent Roll
- Monthly Sales Reports

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
4675 MacArthur Court, Suite 1550, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*):
**MOTION PURSUANT TO 11 U.S.C. § 363(b) TO ENTER INTO PROPERTY MANAGEMENT AGREEMENT WITH JONES LANG LASALLE AMERICAS, INC. AS PROPERTY MANAGEMENT COMPANY EFFECTIVE AUGUST 21, 2026; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **October 30, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*)__________________, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **October 30, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Hon. Scott C. Clarkson
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 30, 2026 | Bambi Clark | /s/ Bambi Clark |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Kyra E Andrassy** kandrassy@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Jessica L Bagdanov** jbagdanov@bg.law, ecf@bg.law
- **Jacob M Barlev** jbarlev@bowlesverna.com, khelms@bowlesverna.com
- **Marcus Colabianchi** mcolabianchi@duanemorris.com, marcus-colabianchi-2595@ecf.pacerpro.com
- **Andrew Michael Cummings** andrew.cummings@hklaw.com, philip.dobbs@hklaw.com;hapi@hklaw.com;sandy.olalde@hklaw.com
- **David B Golubchik** dbg@lnbyg.com, dbg@lnbyg.com
- **Steven T Gubner** sgubner@bg.law, ecf@bg.law
- **Ira David Kharasch** ikharasch@pszjlaw.com
- **Christopher Douglas Lawrence** clawrence@sheppardmullin.com
- **Robert S Marticello** rmarticello@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Kenneth Misken** Kenneth.M.Misken@usdoj.gov
- **John A Moe** john.moe@dentons.com, kathryn.howard@dentons.com;derry.kalve@dentons.com;DOCKET.GENERAL.LIT.LOS@dentons.com
- **Stephen M. Mott** smott@raineslaw.com, csantiago@raineslaw.com;bclark@raineslaw.com
- **David M Poitras** dpoitras@bg.law
- **Todd C. Ringstad** becky@ringstadlaw.com, arlene@ringstadlaw.com
- **David James Root** david.root@bclplaw.com, verlisa.lewis@bclplaw.com
- **Joseph M Rothberg** jmr@lnbyg.com, jmr.LNBYG@ecf.inforuptcy.com
- **Martin W Taylor** marty.taylor@bclplaw.com, shawn.williams@bclplaw.com,marty-taylor-5681@ecf.pacerpro.com
- **United States Trustee (SA)** ustpregion16.sa.ecf@usdoj.gov
- **Christopher A Ward** cward@lowenstein.com, lsuprum@lowenstein.com
- **Sharon Z. Weiss** sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,sharon-weiss-7104@ecf.pacerpro.com